## FEDERAL DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MARK KIRSCHENBAUM,** **Individually, and Derivatively on behalf of** **MICHIGAN LENDERS, LLC ( A NEW** **YORK LIMITED LIABILITY COMPANY)** **Plaintiffs,** **vs.** **HOWARD FENSTERMAN, ABRAMS** **FENSTERMAN FENSTERMAN, EISMAN,** **FORMATO, FERRARA, WOLF &** **CARONE, LLP, PATTI PICCININNI** **Defendants.** | **NO.:** **COMPLAINT AND JURY DEMAND** |

### PARTIES

1.    Plaintiff Mark Kirschenbaum ("Kirschenbaum") is an individual residing in and domiciled in the State of New Jersey.

2.    Derivative Plaintiff, Michigan Lenders, L.L.C. ("Michigan") is a New York Limited Liability Company.

3.    A true copy of the Limited Liability Company Operating Agreement of Michigan Lenders, L.L.C., dated February 23, 2018, is annexed hereto as Exhibit "A"

4.    Kirschenbaum is a member of Michigan Lenders, L.L.C.

5.    Defendant Howard Fensterman ("Fensterman") is an individual residing in and domiciled in the State of New York, an attorney at law of the State of New York and is a member of and the Manager of Michigan Lenders.

6.     Defendant Abrams Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP ("Abrams, Fensterman"), is a New York Limited Liability Partnership, and a law firm doing business in Lake Success and other locations in the  State of New York.

7.     Defendant Howard Fensterman is an, employee and Partner of Defendant Abrams, Fensterman.

8.     Defendant Patti Piccininni ("Piccininni") is an individual residing in and domiciled in the State of New York, an attorney at law of the state of New York and is an employee and Partner of Defendant Abrams Fensterman.

9.     Defendant Abrams Fensterman are the attorneys for Michigan and, upon information and belief, formed that entity and raised the capital for that entity.

## JURISDICTION AND VENUE

10.     The court has jurisdiction over the matter pursuant to 28 USC 1332 inasmuch as the plaintiff and defendants are of Diverse Citizenship and the matter in controversy exceeds $75,000 exclusive of interest, attorneys' fees and costs.

11.     Venue is proper in this Judicial District pursuant to 28 USC 1391 inasmuch as the actions of the defendants giving rise to plaintiffs' complaint took place within this Judicial District.

## COUNT ONE

12.     Plaintiffs repeat each of the foregoing allegations as if more specifically set forth herein.

13.     Kirschenbaum and all other members of Michigan have contributed capital to it, totaling $1,903,000. Of that total, Kirschenbaum has contributed $150,000 on or about March 9, 2018.

14.     Kirschenbaum and all other members of Michigan. are entitled to be paid 13% of their Capital contributions to Michigan per month, for a minimum of seven (7) months and a

BE:11071596.1/KIR072-278219

maximum of forty eight (48) months under Section 4.3 of Michigan's Operating Agreement and, after cessation of payment of those monthly payments, a return of their capital contributions.

15.     Section 4.3 of Michigan's Operating Agreement states as follows:

> **4.3     Cumulative Preferred Allocations.** The Company shall distribute to each Member the following amounts in accordance with this Section 4.3: (i) an amount equal to 13% of such Members capital contribution, payable monthly, for a total of 48 months; and (ii) one payment in an amount equal to such Member's capital contribution. Notwithstanding the foregoing, the Company may, in its sole discretion, prepay on or after the 7th monthly payment as provided in subsection (i) above, all or a portion of the Members' outstanding capital contributions. Upon payment in full by the Company of the Members' outstanding capital contributions, all payment obligations of the Company to the Members set forth in this Section 4.3 shall immediately cease. If a portion, but not all, of the Members' outstanding capital contributions are repaid the above referenced payments will be reduced by the commensurate percentage of any such capital contributions returned. Any Company decision regarding any monetary default by the Company of any of the provisions contained in the Section 4.3, which default remains unsatisfied after 30 days of when payment is due, shall be decided by a majority of the Company's Percentage Interests.

16.     Kirschenbaum has not received any payments, pursuant to section 4.3 from Michigan for the past four (4) months. Further, he has not received a return of his capital contribution.

17.     On Information and Belief, none of the other members of Michigan have received any payments pursuant to section 4.3 from Michigan for the past four (4) months nor have they received a return of their capital contributions.

18.     Kirschenbaum has asked Fensterman, Michigan's Manager, when he will receive his overdue monthly payments and/or a return of his capital contribution pursuant to section 4.3 of Michigan's operating agreement. However, Fensterman has responded, that Michigan will have to sue Champion Care Holdings, MI, LLC ("Champion") (an entity in which Fensterman is also a member and manager) to whom Michigan lent $453,000, pursuant to a March 13, 2018 note, to get the money to pay Kirschenbaum's monthly distribution and/or a return of his capital investment in Michigan.

BE:11071596.1/KIR072-278219

19.     The $453,000 Loan from Michigan to Champion is 100% guaranteed, pursuant to a separate guarantee—Fensterman personally guaranteeing 25% of Champion's repayment of that loan.

20.     Fensterman, is not only a manager and also a member of both Michigan and Champion, but a 25% Guarantor of Champion's re-payment of Michigan's loan to Champion and that the loan is secured by Champion's assets under a separate Pledge and Security Agreement and Fensterman, is part owner of those assets.

21.     Kirschenbaum has requested, in writing, of Michigan and Fensterman, that Fensterman be required to pay his overdue and future distributions pursuant to section 403 and/or return his capital investment in Michigan pursuant to section 4.3 of the Michigan operating agreement, cause Michigan, to  enforce the Guarantees on the Champion Loan (including his own personal guarantee), that Fensterman be required take all necessary actions and to confirm that Michigan has done everything necessary to perfect and protect its security interest in the Champion assets (in which he is part owner) that secure payment of its loan from Michigan

22.     Kirschenbaum has also requested, in writing, of Michigan and Fensterman, that Fensterman be made to account for approximately $1,450,000 in capital (of the total $1,903,000 raised from the Michigan members), over and above the $453,000 lent by Michigan to Champion and that he cause Michigan to pay his outstanding monthly distributions and future monthly distributions and/or return his capital contribution pursuant to section 4.3 of Michigan's operating agreement.

23.     Fensterman has failed to respond on behalf of himself and/or Michigan, to any of several of these requests from Kirschenbaum, constituting a refusal of Michigan to act on Kirschenbaum's requests.

BE:11071596.1/KIR072-278219

24.     Further, by reason of the foregoing, Fensterman has breached his fiduciary duties to Michigan, Kirschenbaum and the other members of Michigan, has engaged in acts of self-interest, self-dealing, has acted in bad faith, has engaged in impermissible conflicts of interest and has otherwise breached his contract with Michigan under the Operating Agreement to act as its Manager.

25.     As a result of the foregoing, Michigan, its members and Kirschenbaum have suffered damages.

26.     By reason of the foregoing, Kirschenbaum is entitled to proceed derivatively on behalf of Michigan Lenders, LLC for an accounting, to require Fensterman to perfect and protect Michigan's security interests under the Pledge and Security Agreement with Champion, to enforce the Guarantees of payment by Champion for repayment of the Michigan Loan (including but not limited to the 25% of that loan that Fensterman personally guaranteed), requiring Fensterman to pay to Michigan the 25% of that loan pursuant to his personal guarantee, for a forfeiture of any management fees collected by or due Fensterman and to enforce Kirschenbaum's rights, individually, to his right to payment of all overdue and future monthly distributions under section 4.3 of Michigan's Operating Agreement and to return Kirschenbaum's capital investment to him pursuant to section 4.3 of the Michigan Operating Agreement.

    **WHEREFORE, plaintiffs Mark Kirschenbaum, individually and derivatively on behalf of Michigan Lenders, LLC demands judgement in their favor and against defendant Howard Fensterman for  the following relief:**

    a)  Compelling defendant Howard Fensterman to cause Michigan Lenders LLC to either pay all overdue monthly distributions and resume making all monthly distributions to the

BE:11071596.1/KIR072-278219

members of Michigan and/or to return to  all members of Michigan their capital contribution as required by section 4.3 of the Michigan Operating Agreement;

b)  Compelling defendant Howard Fensterman to render a full and complete accounting together which such damages as may be disclosed by said accounting;

c)  For recoupment of all management fees paid by Michigan to Fensterman;

d)   For a surcharge upon and/or an adjustment of Fensterman's capital account with Michigan;

e)  Interest;

f)  Attorneys' fees, costs of suit;

g)  In alternative to the relief sought in section (a) supra, judgment compelling Howard Fensterman, at his own expense, to serve on Behalf of Michigan Lenders, LLC, a notice of default upon Champion Care Holdings, M.I. L.L.C. with respect to its obligations under the March 13, 2018 note, declaring the full amount of unpaid principal and interest immediately due and payable, placing a lien on all collateral specified under the pledge and security agreement, and immediately enforcing the personal guarantees of all guarantors of Champion's Note to Michigan (including his own) and requiring Fensterman, on behalf of Michigan, at his own expense, to seek judgment against Champion Care Holdings, M.I. L.L.C. with respect to its obligations under the March 13, 2018 note, declaring the full amount of unpaid principal and interest immediately due and payable and for attorneys' fees and costs of suit, compelling defendant Howard Fensterman to cause Michigan Lenders LLC to either pay all overdue monthly distributions and resume making all monthly distributions to the members of Michigan and/or to return to all members of Michigan their capital contribution as required by section 4.3 of the Michigan Operating Agreement; and

(h)  For such other and further relief as the court may deem equitable and appropriate.

## COUNT TWO

1.      Plaintiffs repeat each of the foregoing allegations as if more specifically set forth herein.

2.      During the several weeks before about March 9, 2018, in order to induce Kirschenbaum to invest in Michigan, Defendant Howard Fensterman and Defendant Patti Piccininni each made material misrepresentations to Kirschenbaum, prior to Kirschenbaum's investment in Michigan, falsely stating that Kirschenbaum's investment in Michigan was "guaranteed".

3.      By further material misrepresentation, neither Fensterman or Piccininni advised Kirschenbaum at the time (although they were required to) that although a planned loan by Michigan (after Kirschenbaum contributed capital to Michigan and became a member) to another entity (Champion) was to an entity in which Fensterman held a financial interest as a result of being a member and manager of that entity:

4.      By further material misrepresentation, at that time, neither Fensterman or Piccininni advised Kirschenbaum at that time (although they were required to), that the planned loan from Michigan to Champion would be personally guaranteed, in part, by Fensterman.

5.      By further material misrepresentation, neither Fensterman or Piccininni advised Kirschenbaum at that time (although they were required to), that the assets of the borrower, Champion, would be the subject of a Pledge and Security Agreement that covered assets partially owned by Fensterman.

6.      By further material misrepresentation, at that time, neither Fensterman or Piccininni advised Kirschenbaum (although they were required to) that the "guarantee" of Kirschenbaum's capital investment in and monthly distributions from Michigan would be substantially impaired

BE:11071596.1/KIR072-278219

by reason of Fensterman's conflict of interest and self-dealing in connection with the planned loan to Champion, if and when Champion defaulted on the loan.

7.      By further material misrepresentation, at that time, neither Fensterman or Piccininni advised Kirschenbaum (although they were required to) that as a result of his conflict of interest and self-dealing, Fensterman would later refuse to cause Michigan to exercise Michigan's right to enforce that guarantee nor exercise Michigan's right to enforce its rights under the Pledge and Security Agreement or exercise its rights under the note from the borrower if and when Champion defaulted on the loan.

8.      The foregoing affirmative material misrepresentations to Kirschenbaum as well as the misrepresentations by silence by Fensterman and Piccininni as well as their failure to disclose to him, things that they had an obligation to disclose, as aforesaid, were made to induce reliance on the part of Kirschenbaum to invest capital in Michigan and were knowingly and/or negligently false when made.

9.      Kirschenbaum reasonably relied on Fensterman's and Piccininni's affirmative misrepresentations and misrepresentations by silence as aforesaid, by investing $150,000 in Michigan to become a member.

10.      As a result of the foregoing, Kirschenbaum suffered and continues to suffer damages proximately caused by the affirmative misrepresentations and misrepresentations by silence of the defendants as aforesaid.

11.      The misrepresentations of Fensterman and Piccininni as aforesaid, both affirmative and by silence, were gross, willful wanton intentional, malicious and morally culpable. Alternatively, the representations as aforesaid were negligently made.

12.     The affirmative misrepresentations and misrepresentations by silence of Fensterman and Piccininni as aforesaid were made within the scope of their employment with Abrams Fensterman, and in their capacity as employees and partners of defendant Abrams Fensterman and they made those misrepresentations and kept silent both to further the financial interests of their client, Michigan, of Abrams Fensterman the conflicts of interest and self-dealing of Fensterman, as well as their own personal financial interests.

13.     At all times herein mentioned, Fensterman, Piccininni and Abrams Fensterman had a duty to Kirschenbaum, to exercise the ordinary reasonable skill and knowledge commonly possessed by members of the legal profession, which they breached, including a duty of reasonable care not to make intentional or negligent affirmative misrepresentations and engage in fraudulent silence  and to commit fraud in order to further the financial interests of clients, of non-clients, of Abrams Fensterman and/or of themselves.

14.     The forgoing, aside from and in addition to legal malpractice, constitutes a violation of New York Judiciary Law 487.

15.     Further, Fensterman, Piccininni and Abrams Fensterman have committed legal malpractice, by failing to exercise the ordinary reasonable skill and knowledge commonly possessed by members of the legal profession, in breaching a duty owed to Kirschenbaum, from whom they solicited capital contributions for Michigan and owed to Michigan and negligently failed to supervise and permitted Fensterman and Piccininni commit fraud, to permit Fensterman and/or Piccininni to breach their duties to Michigan and, Kirschenbaum by engaging in acts of fraud, self-interest, self-dealing, acting in bad faith, engaging in impermissible conflicts of interest and to keep Fensterman from breaching his contract with Michigan under the Operating Agreement to act as its Manager.

BE:11071596.1/KIR072-278219

16.     Further, Fensterman, Piccininni and Abrams Fensterman have committed legal malpractice, by failing to exercise the ordinary reasonable skill and knowledge commonly possessed by members of the legal profession, in breaching a duty owed to Michigan and its members, from whom they solicited capital contributions and negligently failed to supervise and permitted Fensterman and Piccininni to commit fraud, and to permit Fensterman and/or Piccininni to breach their duties to Michigan and its members, by permitting and by failing to supervise Fensterman so as to prevent him from engaging in acts of fraud, self-interest, self-dealing, acting in bad faith, engaging in impermissible conflicts of interest and breaching his contract with Michigan under the Operating Agreement to act as its Manager.

17.     The acts of defendants as aforesaid were willful, wanton, reckless and evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

18.     As a result of the foregoing, Kirshenbaum, Michigan and the other members of Michigan have suffered and continue to suffer damages which were proximately caused by the legal malpractice of defendants as aforesaid.

19.     As a result of the foregoing, Abrams Fensterman is liable in its own right and vicariously liable for the acts of Fensterman and Piccininni and Fensterman and Piccininni who are individually liable as well.

        **WHEREFORE, plaintiff Mark Kirschenbaum, individually and derivatively on behalf of Michigan Lenders, LLC, demands judgement in their favor, and against defendants Abrams Fensterman, Howard Fensterman and Patti Piccininni, jointly and individually, for the following relief:**

        a)  Compensatory and Punitive Damages;

        b)  Treble Damages pursuant to New York Judiciary Law, section 487;

BE:11071596.1/KIR072-278219

c) Interest;

d) Attorneys' fees, costs of suit;

e) For such other and further relief as the court may deem equitable and appropriate.

## <u>JURY DEMAND</u>

Plaintiffs request a jury on all issues so triable.

By:   */s/ David J. Klein, Esq.*

**David J. Klein, Esq. (DJK9675)**
**dklein@bracheichler.com**
**BRACH EICHLER L.L.C.**
101 Eisenhower Parkway
Roseland, New Jersey  07068-1067
(973) 228-5700
Attorneys for Plaintiffs Mark
Kirschenbaum, Individually and
Derivatively on behalf  of Michigan
Lenders, LLC

DATED: July 1, 2020

- 11 -

**EXHIBIT A**

**OPERATING AGREEMENT**

**of**

**MICHIGAN LENDERS, LLC**

**a New York limited liability company**

**February 23, 2018**

The Units represented by this document have not been registered under any securities laws and the transferability of such Units is restricted.  A Unit may not be sold, assigned or transferred, nor shall any assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Unit by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Units shall then be in effect and such transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the reasonable satisfaction of counsel to the Company.

## OPERATING AGREEMENT

## OF

## MICHIGAN LENDERS, LLC

THIS OPERATING AGREEMENT (this "Agreement") of MICHIGAN LENDERS, LLC (the "Company") is made and entered into as of February 23, 2018 by and among the Persons listed on **Exhibit A** attached hereto and made a part hereof (hereinafter sometimes referred to collectively as the "Members" and individually as a "Member").

## SECTION 1

## THE COMPANY

**1.1    Formation.**  The Company is a limited liability company formed pursuant to the provisions of Section 203 of the New York Limited Liability Company Law, as amended from time to time (the "Act").  The Articles of Organization of the Company (the "Articles") were filed with the office of the Secretary of State of the State of New York on February 23, 2018 (the "Commencement Date").  The rights and liabilities of the Members shall be as provided in the Act except as otherwise provided in this Agreement.  The Members agree that all actions taken by the authorized representative for filing the Articles are ratified.

**1.2    Company Name.**  The name of the Company is MICHIGAN LENDERS, LLC.

**1.3    Purposes.**  The purpose of the Company is to conduct any lawful business or activity whatsoever as permitted by applicable law and as determined from time to time by the Manager.  The Company may exercise all powers necessary to or reasonably connected with the Company's business from time to time, and may engage in all activities necessary, customary, related or incidental to any of the foregoing.

**1.4    Principal Place of Business**.  The principal place of business of the Company shall be located at 3 Dakota Drive, Suite 300, Lake Success, New York 11042, or such place as the Manager may determine from time to time.  The Company shall maintain, at its principal office, all records pertaining to the Company as required by the Act.

**1.5    Term.**  The term of the Company commenced on the Commencement Date and shall continue until the Company is dissolved in accordance with the provisions of this Agreement or the Act.

**1.6    Filings; Statutory Agent for Service of Process.**

(a)     The Articles have been filed with the office of the Secretary of State of the State of New York in accordance with the provisions of the Act.  The Manager shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of New York.

(b)     The Manager shall take any and all other actions as may be reasonably

necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any states or jurisdictions other than New York in which the Company engages in business.

(c)     Upon the dissolution of the Company, the Manager shall promptly execute and cause to be filed Articles of Dissolution, or its equivalent, in accordance with the Act and the law of any other states or jurisdictions in which the Company has qualified to conduct business.

1.7     **Defined Terms.**   Unless the context otherwise requires or unless otherwise provided in this Agreement, capitalized terms used in this Agreement shall have the meanings ascribed to them as set forth in **Appendix B** to this Agreement.

## SECTION 2

## MEMBERS, UNITS AND PERCENTAGE INTERESTS

2.1     **Names, Addresses, Units and Percentage Interests of Members.**   The names, addresses, Capital Contributions, number of Units and Percentage Interests of the Members are set forth on Exhibit A hereto.  The Manager shall promptly amend Exhibit A from time to time to reflect the admission or withdrawal of Members; a change in a Member's address; the sale, grant, issuance or redemption of Units; or the receipt of additional Capital Contributions; and any such amendment shall be effective as of the date of the event necessitating such amendment.

2.2     **Certificates for Membership Units.**   A Member's Units may, but need not, be represented by a Certificate of Membership.  The exact contents of a Certificate of Membership, if any, shall be determined by the Manager.

2.3     **Additional Members.**   The Manager may admit to the Company, and issue Units to, Additional Members; provided that any additional members shall execute the joinder to this Agreement in the form attached hereto as **Exhibit B**.

## SECTION 3

## CAPITAL CONTRIBUTION

3.1     **Capital Contributions.**   The Capital Contributions made by the Members are set forth on Exhibit A to this Agreement.  No Member shall be required to make any additional Capital Contributions.

3.2     **Pre-emptive Rights.**   No Member has any preemptive, preferential or other similar right with respect to the issuance or sale of any debt or Units by the Company.

3.3     **Other Matters**.

(a)     Except as otherwise provided in this Agreement, no Member may demand or receive a return of the Member's Capital Contribution or withdraw from the Company.  Under

circumstances requiring a return of any Capital Contribution, no Member shall have the right to receive property other than cash, except as may be specifically provided in this Agreement.

(b)    Subject to Section 4.3 below, no Member shall receive any interest, salary or draw with respect to its Capital Contribution or its Capital Account or otherwise solely in its capacity as a Member.

(c)    No Member or Manager shall be liable for the debts, liabilities, contracts or any other obligations of the Company, except as otherwise provided in the Act.  It is the intention of the Manager and Members that the Manager and Members shall have the benefit of Section 609 of the Act.

## SECTION 4

## CAPITAL ACCOUNTS AND ALLOCATIONS

**4.1    Capital Accounts.**  A Capital Account shall be maintained for each Member in the manner set forth in Appendix B to this Agreement.

**4.2    Profits, Losses and Tax Items.**  After giving effect to Section 4.3 below, the Profits and Losses and any tax items of the Company are to be allocated among the Members as set forth in Appendix A to this Agreement.

**4.3    Cumulative Preferred Allocations.**   The Company shall distribute to each Member the following amounts in accordance with this Section 4.3: (i) an amount equal to 13% of such Members capital contribution, payable monthly, for a total of 48 months; and (ii) one payment in an amount equal to such Member's capital contribution.   Notwithstanding the foregoing, the Company may, in its sole discretion, prepay on or after the 7th monthly payment as provided in subsection (i) above, all or a portion of the Members' outstanding capital contributions.  Upon payment in full by the Company of the Members' outstanding capital contributions, all payment obligations of the Company to the Members set forth in this Section 4.3 shall immediately cease. If a portion, but not all, of the Members' outstanding capital contributions are repaid the above referenced payments will be reduced by the commensurate percentage of any such capital contributions returned.  Any Company decision regarding any monetary default by the Company of any of the provisions contained in the Section 4.3, which default remains unsatisfied after 30 days of when payment is due, shall be decided by a majority of the Company's Percentage Interests.

## SECTION 5

## DISTRIBUTIONS TO MEMBERS

**5.1    Distributions.**   Except as otherwise provided in Section 10 with respect to distributions upon a liquidation of the Company, Net Cash from Operations, if any, shall be distributed in accordance with Section 4.3 above.

**5.2    Treatment of Taxes Withheld.**  All amounts withheld or paid by the Company

3

pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to a Member, or any such amount that is paid by the Company solely by reason of the holding of an Interest by any Member, shall be treated as an advance from the Company to the Member with respect to whom such tax is required to be withheld.  The Company has the right to apply any amounts (including any Mandatory Tax Distribution Amounts) otherwise distributable to a Member, or otherwise payable by the Company to such Member under any other provision of this Agreement, to the payment of the outstanding balance of such Member's advances described in the immediately preceding sentence.  The obligation of a Member to pay the outstanding balance of such Member's advances under this Section 5.2 shall continue after such Member transfers its interest in the Company and after a withdrawal by such Member.  Each Member shall furnish the Company with any information, representations or forms as shall reasonably be requested by the Company to assist it in determining the extent of, or in fulfilling, any withholding obligations it may have.

## SECTION 6

## MANAGEMENT AND CONTROL

    **6.1**    **Management.**

        (a)    Except as otherwise set forth in this Agreement or as required by the Act, the business and affairs of the Company shall be managed by one (1) manager (the "Manager"). Subject to the limitations imposed by the Act and this Agreement, the Manager shall manage and control, and have authority to obligate and bind, and make all decisions affecting the Company and its business and assets.  The Manager may, but need not be, a Member of the Company. Upon the execution of this Agreement, the Manager shall be Howard Fensterman.

        (b)    The Manager shall serve until the earlier of his death, incapacity or resignation.  The Manager may resign as the Manager at any time by giving written notice to the Members.  The resignation of the Manager shall be deemed to take effect upon delivery of written notice to the Members unless such later time is specified in the notice.  Any vacancy in the position of Manager shall be filled by the Members holding at least a majority of the outstanding Units.

    **6.2**    **Officers.**  The Manager may appoint individuals as officers of the Company, which may include (a) a President; (b) one or more Vice Presidents; (c) a Secretary and/or one or more Assistant Secretaries; and (d) a Treasurer and/or one or more Assistant Treasurers.  The Manager may delegate a portion of his day-to-day management responsibilities to any such officer or officers, as determined by the Manager from time to time, and such officers shall have the authority to contract for, negotiate on behalf of and otherwise represent the interests of the Company as so authorized by the Manager, provided that in no event shall any officer have any rights, duties, powers or authority greater than that so delegated or that of the Manager.

    **6.3**    **Rights and Powers of the Manager.**  Subject to the limitations imposed by the Act and this Agreement, the Manager, in his full and exclusive discretion, shall manage and control, have authority to obligate and bind, and make all decisions affecting the business and

assets of the Company. The Manager shall act as the tax matters Member (the "Tax Matters Member") in the same capacity as the "Tax Matters Partner" of a partnership as referred to in Section 6231(a)(7)(A) of the Code. The Manager may adopt by-laws that are not inconsistent with the Articles or this Agreement and that are for the regulation of the Members, the Manager or any other matter affecting the management of the Company, including, but not limited to, books and records of account, minutes of proceedings, meetings, requirements for notices of meetings, computation of time for notice, method of giving notice, quorum requirements, written action in lieu of a meeting, waiver of notice, proxies and officers.

### 6.4   **Rights and Obligations of the Manager and the Members**.

   (a) Each Member shall have one vote for each Unit held by such Member. However, except as otherwise expressly provided in this Agreement, no Member shall be entitled to participate in the control and management of the Company, nor cast any vote or grant any consent on any subject matter, nor shall any Member have the right to sign for or bind the Company except when acting as a duly designated Manager or when acting within the scope of powers properly delegated by the Manager to a Member, officer, employee or agent of the Company.

   (b) A Member's rights under this Agreement, including without limitation, a Member's right to vote in his/her/its capacity as a Member, shall not be affected by also being the Manager or serving in any other capacity for or on behalf of the Company.

   6.5 **Non-Exclusivity.** Except as set forth in the Agreement or any other written agreement among the parties, the creation of the Company and the assumption by the Members and the Manager of their duties under this Agreement shall be without prejudice to the rights of the Members and the Manager (or the rights of their affiliates) to pursue or participate in other interests and activities including, without limitation, investments in and devotion of time to other businesses, and to receive and enjoy profits or compensation therefrom.

   6.6 **Indemnification.** To the fullest extent permitted by applicable law from time to time in effect:

   (a) The Company shall indemnify and hold harmless the Manager, Members, officers, agents and employees of the Company and their respective directors, trustees, shareholders, members, partners, officers, employees, agents and other Affiliates, against all costs, liabilities, claims, expenses, including reasonable attorneys' fees and disbursements, and damages (collectively, "Losses") paid or incurred by any such Person in connection with the conduct of the Company's business; and

   (b) The Company shall indemnify, defend and hold the Manager harmless from and against, and may, upon the approval of the Manager, indemnify, defend and hold the Company's and the Manager's respective Affiliates, agents, employees, consultants and other independent contractors (collectively, "Indemnitees"), harmless from and against, all Losses arising from any demands, claims or lawsuits against any of the Indemnitees in connection with or resulting from his acts or omissions in his capacity as the Manager, or as such an Affiliate, agent, employee, consultant or other independent contractor of the Company or the Manager, or

in connection with, arising from or relating to, business or activities undertaken on behalf of the Company, including, without limitation, any demands, claims or lawsuits initiated by a Member, unless a judgment or other final adjudication adverse to such Indemnitee establishes that (i) such acts or omissions were committed in bad faith, or were the result of active and deliberate dishonesty, (ii) such Indemnitee personally gained a financial profit or other advantage to which he or she was not legally entitled, or (iii) such acts or omissions violated such lesser standard of conduct as under applicable law affirmatively prevents indemnification hereunder.   The termination of any action, suit or proceeding by judgment, order, settlement, plea of nolo contendere or its equivalent or conviction shall not, of itself, create a presumption that an Indemnitee shall not be entitled to indemnification hereunder or that the Indemnitee did not act in good faith and in a manner which it reasonably believed to be in or not opposed to the best interests of the Company.

(c)      Promptly after receipt by an Indemnitee of notice of the commencement of any proceeding against such Indemnitee, such Indemnitee shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Manager of the commencement of such proceeding, provided that the failure of an Indemnitee to give notice as provided herein shall not relieve the Company of its obligations under Sections 6.6(a), 6.6(b) and 6.6(g), except to the extent that the Company is prejudiced by such failure to give notice.  In case any such proceeding is brought against an Indemnitee (other than a proceeding by or in the right of the Company), after the Company has acknowledged in writing its obligation to indemnify and hold harmless the Indemnitee, the Company will be entitled to assume the defense of such proceeding; *provided*, that (a) the Indemnitee shall be entitled to participate in such proceeding and to retain its own counsel at its own expense and (b) if the Indemnitee shall give notice to the Company that in its good faith judgment certain claims made against it in such proceeding could have a material adverse effect on the Indemnitee or its Affiliates other than as a result of monetary damages, the Indemnitee shall have the right to control (at its own expense and with counsel reasonably satisfactory to the Company) the defense of such specific claims with respect to the Indemnitee (but not with respect to the Company or any other Member); and *provided further, however*, that if an Indemnitee elects to control the defense of a specific claim with respect to such Indemnitee, such Indemnitee shall not consent to the entry of a judgment or enter into a settlement that would require the Company to pay any amounts under Sections 6.6(a) and 6.6(b) without the prior written consent of the Company, such consent not to be unreasonably withheld.  After notice from the Company to such Indemnitee acknowledging the Company's obligation to indemnify and hold harmless the Indemnitee and electing to assume the defense of such proceeding, the Company will not be liable for expenses subsequently incurred by such Indemnitee in connection with the defense thereof.  Without the consent of such Indemnitee, the Company will not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee of a release from all liability arising out of the proceeding and claims asserted therein.  Any decision that is required to be made by the Company pursuant to Section 6.6(a), 6.6(b) or 6.6(g) or this Section 6.6(c) shall be made on behalf of the Company by the Manager if the Manager does not have a financial interest in the outcome of the decision, or if the Manager does have a financial interest in the decision, by the affirmative vote of the Members holding at least a majority of the Units.

(d)      The rights of an Indemnitee set forth in this Section 6.6 shall not be

exclusive of any other rights to which it may be entitled, whether by separate agreement or otherwise, nor shall such rights limit or affect any other such rights.  All rights of an Indemnitee under this Section 6.6 shall survive the dissolution of the Company, and shall inure to the benefit of his or its heirs, personal representatives, successors and assigns.

(e)     Notwithstanding anything contained herein to the contrary, any amount to which an Indemnitee may be entitled under this Section 6.6 shall be paid only out of the assets of the Company and any insurance proceeds available to the Company for such purposes.  No Member shall be personally liable for any amount payable pursuant to this Section 6.6, or to make any Capital Contribution, return any distribution made to it by the Company, or restore any Negative Capital Account balance to enable the Company to make any such payment.

(f)     The Company may purchase and maintain insurance or furnish similar protection, including, but not limited to, trust funds, letters of credit or self-insurance, for or on behalf of an Indemnitee and such other Persons as the Manager shall determine. The insurance or similar protection purchased or maintained for those persons may be for any liability asserted against them and incurred by them in any capacity described in this Section 6.6 or for any liability arising out of their status as described in this Section 6.6, whether or not the Company would have the power to indemnify them against that liability under this Section 6.6.

(g)     To the fullest extent permitted by applicable law, the Company shall pay the expenses (including reasonable legal fees and expenses and costs of investigation) incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding in any way related to or arising out of this Agreement, the Company or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of such Indemnitee on behalf of the Company (other than a claim, demand, action, suit or proceeding brought by the Company against a Member for such Member's breach or violation of this Agreement) as such expenses are incurred by such Indemnitee and in advance of the final disposition of such matter, provided that such Indemnitee undertakes to repay such expenses if it is determined by agreement between such Indemnitee and the Company or, in the absence of such an agreement, by a final judgment of a court of competent jurisdiction that such Indemnitee is not entitled to be indemnified pursuant to Sections 6.6(a) and 6.6(b).  Any claim for advancement of expenses shall set forth in reasonable detail the basis for the claim.

**6.7**     **Exculpation**.  A Manager or Member shall not be personally liable to the Company or its Members for damages for any breach of duty as a Manager or Member, except for any matter in respect of which such Manager or Member would be liable by reason that, in addition to any and all other requirements for such liability, there shall have been a judgment or other final adjudication adverse to such Manager or Member that establishes that such Manager's or Member's acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or that such Manager or Member personally gained in fact a financial profit or other advantage to which such Manager or Member was not legally entitled, or that with respect to a distribution the subject of Section 508 of the Act a Manager's acts were not performed in accordance with Section 409 of the Act.  Neither the amendment nor the repeal of this Section 6.7 shall eliminate or reduce the effect of this Section 6.7 in respect to any matter occurring, or any cause of action, suit or claim, that, but for this Section 6.7, would accrue or arise, prior to such amendment or repeal.  This Section 6.7 shall

7

neither eliminate nor limit the liability of a Manager or Member for any act or omission occurring prior to the adoption of this Section 6.7.

**6.8** **Reliance on Acts of the Manager.**  No financial institution or any other Person dealing with the Manager is required to ascertain whether such Manager is are acting in accordance with this Agreement, and the financial institution or such other Person shall be protected in relying solely upon the deed, transfer or assurance of, and the execution of any instrument or instruments by such Manager.

## SECTION 7

## BOOKS AND RECORDS

**7.1** **Books and Records.**  The Company shall keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records shall be otherwise kept in accordance with the provisions of the Act.  Any Member or its designated representative shall have the right, at any reasonable time, to have access to and to inspect and copy the contents of such books or records.

**7.2** **Fiscal Year.**  The accounting period and fiscal year of the Company shall end on December 31 of each year (the "Fiscal Year").

## SECTION 8

## TRANSFERS OF UNITS

**8.1** **Restriction on Transfers**.  Except as otherwise permitted by this Agreement, no Member may transfer all or any portion of its Units without the prior written consent of the Manager, which consent may be withheld for any reason.

**8.2** **Non-Restricted Voluntary Transfers of Units**.  Notwithstanding Section 8.1 above, subject to the conditions and restrictions set forth in Section 8.3 below, the Units of any Member may be Transferred (a "Permitted Transfer") without the prior written consent of the Manager, to any Person without complying with Section 8.4 of this Agreement solely in accordance with the following:

(a)  A Member who is a natural person may Transfer all or any portion of such Member's Units by gift, sale, will or otherwise, to one or more members of such Member's "family" (as defined below), to a trust substantially for the benefit of such Member and/or for the benefit of one or more members of such Member's family, to one or more beneficiaries of any trust that is or was a Member, to a corporation of which such Member and/or such Member's family and/or family trust are the majority shareholders or to a partnership or limited liability company in which such Member and/or such Member's family and/or family trust collectively hold the controlling interest.

(b)  A Member that is a partnership, corporation, limited liability company, trust or similar entity (each, an "Entity Member") may Transfer all or any portion of such Entity

Member's Units to (i) one or more partners, shareholders, members, beneficiaries or similar owners of or investors in such Entity Member (each, an "Entity Member Owner"), (ii) to any member of an affiliated group of corporations within the meaning of Section 1504 of the Code that includes such Entity Member or (iii) to a trust substantially for the benefit of (x) one or more Entity Member Owners or (y) one or more members of the family of the Entity Member Owner.

(c)     A Member may Transfer all or any portion of the Member's Units to another Member or the Company.

(d)     As used in this Agreement, "family" means only the spouse, issue (whether natural or adopted), sibling or parent of a Member.  Notwithstanding any provision of this Section 8.2 to the contrary, no Transfer is permitted under this Section 8.2 to or for the benefit of a separated or divorced spouse by agreement, Court order or otherwise.  Any Transfer of Units made pursuant to this Section can be made only in such manner as to provide control of such Units by a competent legal entity or adult (unless such transfer is to a custodian for such minor person under an act regarding transfers to minors or to the trustee of a trust for the benefit of such minor person), and so as not to vest control of any Units in any minor or other legally incompetent person.

**8.3     Conditions to Permitted Transfers.**  A Transfer shall not be treated as a Permitted Transfer unless and until the following conditions are satisfied:

(a)     The transferor and transferee must execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement.  In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)     The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, and any other information necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns.  Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Units until it has received such information.

(c)     Either (i) such Units shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (ii) the transferor shall provide, upon the Company's reasonable request, an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer does not violate any applicable laws regulating the transfer of securities.

(d)     The transferor may grant to any transferee of Units pursuant to a Permitted Transfer the right to become a substitute Member with respect to the Units transferred; provided, however, that such transferee shall not become a substitute Member unless and until the admission of such assignee or transferee is consented to in writing by the Manager.

(e)      All transferees hereunder shall execute the joinder to this Agreement in the form attached hereto as **Exhibit B** agreeing to be bound by the terms of this Agreement in the same manner as the transferors and any Units so transferred shall continue to be subject to the restrictions, liabilities and benefits associated therewith.

**8.4    Restricted Voluntary Transfers of Units**.

(a)      (i)      Except as otherwise permitted by Sections 8.1, 8.2, or this Section 8.4, no Member may Transfer any Units.  If a Member desires to transfer any of its Units to a third party who is not a Permitted Transferee, then such Member desiring to make the Transfer (the "Transferor") must first obtain a *bona fide* written offer from such third party to purchase any of such Member's Units in the Company and then first offer to sell such Units (the "Offered Units") to the Company and/or other Members (the "Other Members") in accordance with this Section 8.4(a).  The *bona fide* offer must state (x) the name and address of the proposed transferee, (y) the amount of consideration that shall be received by the Transferor for the transfer and (z) the payment terms of the consideration and other material terms and conditions of the proposed Transfer.

(ii)      Within fifteen (15) days of the receipt of the bona fide offer, the Transferor shall furnish the Company and the Other Members with a copy of such offer.  Within thirty (30) days of the receipt of the offer, the Company may elect to purchase all, but not less than all, of the Offered Units on substantially the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within those thirty (30) days.  If the Company does not elect to purchase all of the Offered Units, then the Other Members may elect to purchase all, but not less than all, of the Offered Units in proportion to their Percentage Interests (or in such proportion as such Other Members may agree) on substantially the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within thirty (30) days of their receipt of a copy of the bona fide offer.  If one (or more) of the Other Members does not exercise such option, then such option shall be exercisable within such thirty day (30) period by the Other Members in proportion to their Percentage Interests (not counting the Percentage Interest of the selling Member or any Other Member not exercising such option).

(iii)      In the event the Company or the Other Members elect to purchase all of the Offered Units, the closing of the purchase shall take place on the first business day following the end of a period thirty (30) days after delivery to the Transferor of the last written notice of the election to purchase, or on such other date as mutually agreed upon by the parties.

(iv)      If the Company or the Other Members do not elect to purchase all of the Offered Units, the Transferor may transfer the Offered Units to the transferee named in, and on the terms and conditions set forth in, the notice, subject to the limitations of this Section 8.4.  If the Transferor fails to conclude such sale of the Offered Units within forty-five (45) days after the Transfer became authorized under this Section 8.4(a)(iv), the Offered Units shall again become subject to all of the restrictions of this Section 8.4.

(b)      No Transfer or assignment pursuant to Section 8.4(a)(iv) shall be effective as to the Other Members or the Company unless and until (i) a copy of an instrument of

assignment executed by the Transferor and the transferee, in form satisfactory to the Company, that indemnifies the Company against loss or liability arising out of such assignment, has been received by the Company, (ii) the transferee executes and delivers to the Company such documents as the Company deems necessary or appropriate to effect the Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement and (iii) the transferee, upon the reasonable request of the Company, provides the Company with an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company, to the effect that the Transfer shall be exempt from all applicable registration requirements and that such Transfer shall not violate any applicable laws regulating the transfer of securities. Thereafter, the Company shall remit directly to the transferee all distributions to which the transferee may be entitled pursuant to the provisions of this Agreement and the assignment.

(c)     A Member who has assigned a Unit in the Company pursuant to this Section 8.4, whether or not the assignee has become a substituted Member, shall not thereafter be entitled to exercise any of the rights of a Member with respect to such transferred Unit nor have any other rights or obligations as a Member with respect to such transferred Unit except as otherwise provided by the Act.

(d)     Any Unit transferred pursuant to this Section 8.4 shall remain subject to all of the provisions of this Agreement. Any Member that Transfers all of its Units in accordance with this Section 8.4 to a transferee which is not a Member may grant to that transferee the right to become a Member; provided, however, that such transferee shall not become a substitute Member unless and until the admission of such transferee is consented to in writing by the Manager, whose consent shall not be unreasonably withheld.

**8.5     Prohibited Transfers**.

(a)     Any purported Transfer of a Unit that is not made pursuant to this Section 8, shall be null and void and of no effect whatsoever. Nevertheless, if the Company is required to recognize a Transfer that is not made pursuant to this Section 8, the Units transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Units, which allocations and distributions first may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Units may have to the Company. Neither the transferee nor the transferor shall have any rights as to the management of the Company with respect to such transferred Units. The Company shall have the option to purchase from the transferee all, but not less than all, of the Units that were subject to the non-complying Transfer by delivering written notice to the transferee of the Company's exercise of the option to purchase such Units at any time within one year after the Company has knowledge of a Transfer that was not made pursuant to this Section 8, to the extent permitted by law. The Company may assign all or part of its right to purchase such transferee's Units to the nontransferring Members on a pro rata basis (based on the number of Units held by each at the time) or such other basis as such Members agree. The purchase price shall be an amount equal to the book value of such Units as of the end of the Company's immediately preceding Fiscal Year. Book value shall be determined in accordance with generally accepted accounting principles, and the terms of sale for such Units shall be determined by the Manager.

(b)     In the case of a Transfer or attempted Transfer of a Unit that is not made pursuant to this Section 8, the parties engaging or attempting to engage in such Transfer shall indemnify and hold harmless the Company and the other Members from all costs, liability, and damage that any of those indemnified Persons may incur (including, without limitation, incremental tax liability and reasonable attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and as a result of efforts to enforce the Company's and the other Members' rights under this Section 8.5 and the rights to indemnification of those Persons entitled to indemnification under this Section 8.5.

**8.6**     **Representations; Legend.**  Each Member hereby represents and warrants to the Company that such Member's acquisition of a Unit hereunder is made for such Member's own account and not for resale or distribution of such Unit.  Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement, any certificate of membership interests, or any other document or instrument evidencing ownership of a Unit:

> The Units represented by this document have not been registered under any securities laws and the transferability of such Units is restricted.  A Unit may not be sold, assigned or transferred, nor shall any assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Unit by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Unit shall then be in effect and such transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the reasonable satisfaction of counsel to the Company.

**8.7**     **Distributions and Allocations with Respect to Transferred Units.**  If any Unit is transferred during any accounting period in compliance with the provisions of this Section 8, Profits, Losses, each item thereof, and all other items attributable to the transferred Unit for such period shall be divided and allocated between the transferor and the transferee, by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager.  All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that if the Company does not receive a notice stating the date such Unit was Transferred and such other information as the Company may reasonably require within thirty (30) days after the end of the accounting period during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Member who, according to the books and records of the Company, on the last day of the accounting period during which the transfer occurs, was the owner of the Unit.  Neither the Company, the Manager nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 8.7, whether or not the Company has knowledge of any Transfer of ownership of any Unit.

**SECTION 9**

## WITHDRAWAL OF A MEMBER

**9.1**   **Withdrawal of a Member.**   Unless otherwise provided in this Agreement, a Member shall cease to be a Member upon the happening of any of the following events of "Withdrawal":

(a)   In the case of a Member who is acting as a Member by virtue of being trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(b)   In the case of a Member that is an entity, the dissolution and commencement of the winding-up of such entity or the filing of a statement of dissolution or its equivalent, as applicable;

(c)   In the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire Interest in the Company;

(d)   In the case of a Member that is an individual, the death of the Member or the entry of an order by a Court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(e)   Upon the Bankruptcy of a Member;

(f)   A Member assigns or transfers all of such Member's Interest in the Company; or

(g)   The redemption of all of a Member's Units by the Company.

**9.2**   **Rights of a Withdrawing Member.**   In the event of a Withdrawal (other than pursuant to Section 9.1(f) or 9.1(g)) by any Member from the Company prior to the expiration of the Company's term (as set forth in Section 1.5 of this Agreement):

(a)   (i)   The Company shall have the option to purchase the entire Interest *(i.e.,* all of the Units) of the withdrawing Member for an amount equal to the "fair market value" of such Interest; provided, however, that the foregoing option to purchase shall not apply to any Withdrawal resulting from, or which result in, transfers pursuant to Sections 8.2 or 8.4 hereof or pursuant to a written agreement between the Company and one or more Members.   The Company shall exercise its option to purchase by giving notice to the withdrawing Member within ninety (90) days after (i) the Company receives notice of Withdrawal of the Member, or (ii) if applicable and later, the appointment of the legal representative of the deceased, bankrupt, insane or incompetent Member.   The closing of such purchase shall close within sixty (60) days after the date of notice.   Until such option is exercised and/or payment made thereunder, the withdrawing Member shall be entitled to receive distributions applicable to the withdrawing Member's Interest but shall not otherwise be entitled to participate in the Company as a Member.

(ii)   For purposes of this Section 9.2, "fair market value" of a Member's

Interest (which shall include all of his or her Units) shall mean an amount agreed to by the Company and the withdrawing Member or, if such parties cannot agree, an amount determined by an independent valuation firm jointly selected by the Company and the withdrawing Member; provided, however, if the parties are not able to agree on an appraisal company, then each of the Company and the withdrawing Member shall select an independent appraisal company that together shall select a third independent appraisal company who shall then determine the fair market value of the withdrawing Member's Interest.  The costs of a valuation firm shall be borne fifty percent (50%) by the Company and fifty percent (50%) by the withdrawing Member.

(iii)     The purchase price shall be paid in four (4) equal annual installments commencing on the first anniversary of the date of closing.  The Company's obligations to make these installment payments shall be evidenced by a promissory note, in the form attached hereto as **Exhibit C**, which shall bear interest at the minimum rate necessary to avoid imputed interest under the Code, and shall be payable in full at any time without prepayment penalty.  Any prepayment shall be applied first to accrued interest and then to installments in the reverse order in which they are due.

(iv)     If the Company does not elect to purchase the Interest of such withdrawing Member in accordance with this Section, then the successor in interest to such withdrawing Member ("Successor in Interest") shall be an assignee of the Interest of the withdrawing Member that the Company did not elect to purchase.  In such event, the Successor in Interest shall not become a Member unless and until the admission of the Successor in Interest as a Member is consented to in writing by the Manager, and provided further that the Successor in Interest executes and delivers such documents as the Manager may reasonably require to make the Successor in Interest a party to this Agreement.

(b)     If a Member withdraws from the Company in contravention of this Agreement, in addition to any other remedies available to the Company under applicable law, the Company may recover from the withdrawing Member damages for breach of this Agreement and may offset the damages against the amount otherwise distributable to such member on account of its Interest.

**9.3    Company to Continue Upon Withdrawal.**  The Company shall not dissolve upon the withdrawal of a Member, but shall continue until dissolved in accordance with Section 10.

**9.4    No Right to Receive Distributions Upon Withdrawal.**  No Member shall have the right to receive any distribution, other than pursuant to the express terms of this Agreement, prior to the Company's dissolution pursuant to Section 10 of this Agreement.

## SECTION 10

## DISSOLUTION OF THE COMPANY

**10.1    Dissolution Events.**  The Company shall dissolve and commence winding up and

14

liquidation upon the first to occur of any of the following (each, a "Dissolution Event"):

> (a)     A merger or consolidation of the Company with one or more other entities in which the Company is not the surviving entity;

> (b)     The happening of any other event that makes it unlawful, impossible or impractical to carry on the business of the Company;

> (c)     The decision of the Manager to dissolve the Company;

> (d)     Upon entry of a decree of judicial dissolution under Section 702 of the Act; and

> (e)     the sale or other disposition of all or substantially all of the business or assets of the Company.

> The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

**10.2    Winding Up.**   Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members.  No Member shall take any action that is inconsistent with, or not necessary to or appropriate for the winding up of the Company's business and affairs.  The Company's assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order:

> (a)     First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Members;

> (b)     Second, to the payment and discharge of all of the Company's debts and liabilities to Members, including without limitation, all amounts due and owing to the Members pursuant to Section 4.3; and

> (c)     The balance, if any, to the Members pro rata in proportion to their positive Capital Account balances, after giving effect to all contributions, distributions, and allocations for all taxable periods, including the period during which the Dissolution Event occurs.  The parties intend that the allocation provisions contained in **Appendix A** shall produce final Capital Account balances of the Members that shall permit liquidating distributions that are made in accordance with final Capital Account balances pursuant to this Section 10.2(c).    To the extent that the allocation provisions contained in **Appendix A** fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager if and to the extent necessary to produce such result, (ii) Profits and Losses of the Company for any open years (or items of gross income and deduction of the Company for such open years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of Profits or Losses (or items of gross income and deduction) for the current and future years, and (iii) the provisions of this sentence shall control notwithstanding any

15

reallocation or adjustment of Profits or Losses (or items thereof) by the Internal Revenue Service or other taxing authority.

Any distribution to a Member pursuant to clauses 10.2(b) or (c) above shall be net of any amounts owed to the Company by such Member. No Member shall receive any additional compensation for any services performed pursuant to this Section 10.

**10.3** **Compliance With Timing Requirements of the Regulations.** In the event the Company is "liquidated" within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, distributions shall be made pursuant to this Section 10.3 to the Members who have positive Capital Accounts in compliance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations. If any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 10.3 may be handled in one or both of the following manners:

(a) distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust are to be distributed to the Members from time to time, in the discretion of the Manager, in the same proportion as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; and

(b) withheld to provide a reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, but such withheld amounts are to be distributed to the Members as soon as reasonably practicable.

**10.4** **Deemed Contribution and Distribution.** Notwithstanding any other provision of this Section 10, in the event the Company is liquidated within the meaning of Section 1.708-2(b)(2) of the Regulations but no Dissolution Event has occurred, the Company's assets shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, except as otherwise provided in applicable Regulations, the Company shall be deemed to have contributed all of its assets and liabilities to a new limited liability company and immediately thereafter to have distributed the interest in such new limited liability company to the Members in proportion to their respective Interests in the Company.

**10.5** **Rights of Members.** Except as otherwise provided in this Agreement, (a) each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company, and (b) no Member shall have priority over any other Member as to the return of the Member's Capital Contribution, distributions or allocations.

**10.6    Prohibition on Withdrawal.**  Except as otherwise provided in Sections 8 or 9 of this Agreement or another written agreement between the Company and one or more Members, no Member is entitled to withdraw from the Company prior to the Company's dissolution pursuant to this Section 10.  Under no circumstances, other than pursuant to the express terms of this Agreement, shall the Company be required to make any distribution prior to the Company's dissolution pursuant to this Section 10.

## SECTION 11

## MEETINGS OF MEMBERS

**11.1    Meetings.**   Meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Manager, and must be called at the request in writing of any Member or group of Members holding at least ten percent (10%) of the Units. The Manager, or such other Person as designated by the Manager, shall preside at all meetings of the Members.

**11.2    Place of Meetings.**   The Manager may designate any place, either within or outside the State of New York, as the place of meeting for any meeting of the Members.  If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be at the Company's principal place of business as set forth in Section 1.4 hereof.  Any Member may attend via telephonic or other electronic communication.

**11.3    Notice of Meetings.**   Except as provided in Section 11.4 hereof, the Manager shall deliver or cause to be delivered a notice of such meeting to each Member entitled to vote at such meeting.  Said notice must be delivered not less than ten (10) days nor more than sixty (60) days before the date of such meeting and must state the place, day and hour of the meeting and the purpose or purposes for which the meeting is called.

**11.4    Meeting of all Members.**   If all of the Members shall meet at any time and place, either within or outside of the State of New York, and they consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.  Any Member attending any meeting (whether in person or by proxy) as to which proper notice pursuant to Section 11.3 was not given, and not objecting to the lack of notice, shall be deemed to have given his or her consent to the holding of the meeting without proper notice.

**11.5    Record Date.**  For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 11.5, such determination shall apply to any adjournment thereof.

**11.6    Quorum.**  Members holding a majority of the outstanding Units entitled to vote

on the matters to be presented at a meeting of the Members, whether represented in person or by proxy, shall constitute a quorum at such meeting.  In the absence of a quorum at any such meeting, the Members holding at least a majority of the Units so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, then a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.  At such adjourned meeting at which a quorum is present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Units whose absence would cause less than a quorum.

**11.7    Manner of Acting; Dissenters' Rights.**  If a quorum is present, the affirmative vote of Members holding at least a majority of the outstanding Units entitled to vote on the subject matter shall be the act of the Members, unless the vote of a greater or lesser proportion or number or separate class vote is otherwise required this Agreement, or a greater proportion or number is required by the Act.  Unless otherwise mandatory under the Act, the Articles, or this Agreement, Members are not entitled to and have no rights to relief as dissenting Members under any provision of the Act or other applicable law.

**11.8    Proxies.**  At all meetings of the Members, a Member may vote in person or by written proxy executed by the Member or by such Member's duly authorized attorney-in-fact.  Such proxy is to be filed with the Company before or at the time of the meeting.  No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

**11.9    Action by Members Without a Meeting.**  Action required or permitted to be taken at a meeting of the Members may be taken without a meeting if such action is approved by the Members holding at least a majority (or such greater number as may be required by law or this Agreement) of the outstanding Units entitled to vote on the action and such approval is evidenced by one or more written consents describing the action taken, signed by the requisite number of qualified Members and delivered to the Company for inclusion in the minutes of the Company or for filing with the Company records.  Action taken under this Section 11.9 is effective when the requisite number of qualified Members have signed the consent, unless the consent specifies a different effective date.  The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.  To the extent required under the Act, notice of any action taken under this Section 11.9 shall be given by the Company to each Member who did not sign a written consent with respect to such action.

**11.10    Waiver of Notice.**  When any notice is required to be given to any Member, a waiver of the notice in writing signed by the Person entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of the notice.

**SECTION 12**

**AMENDMENTS**

**12.1** **Authority to Amend**. Amendments to this Agreement shall be made by the Manager.

## SECTION 13

## ACKNOWLEDGMENT

**13.1** **Acknowledgment**.

(a)    Each Member hereby represents and warrants to the Company and each other Member as follows:

(i)    Such Member acknowledges that:

(A)    the Interest owned by he/she/it has not been registered under the Securities Act of 1933, the New York State securities laws or any other applicable state securities laws (collectively, the "Securities Acts") because the Company is issuing (or a Member has Transferred) such Interest in reliance upon exemptions from the registration requirements contained in the Securities Acts for issuances not involving a public offering;

(B)    the Company (or the transferor) has relied upon the fact that the Interest is to be held by such Member for investment purposes only, and not with a view to any resale or distribution thereof; and

(C)    the Company is under no obligation to register or qualify the Interest or to assist any Member or Successor In Interest, as applicable, in complying with any exemption from registration under the Securities Acts if such Member wishes to dispose of the Interest.

(b)    Each Member is acquiring the Interest for his/her/its own account, for investment purposes only, and not with a view to the resale or distribution thereof, unless there are effective registrations or other qualifications relating thereto under applicable Securities Acts.

(c)    Before acquiring the Interest, each Member investigated the Company and its business, and the Company made available to he/she/it all information necessary to make an informed decision to acquire the Interest.

(d)    Each of the parties hereto and each of the substitute Members hereinafter becoming a signatory hereto, acknowledge that each such party or substitute Member has been advised of and hereby approves of the application of the Company funds to pay all costs and expenses incurred in connection with the formation of the Company and admission of the Members, including, without limitation, legal fees, registration fees and filing and recording charges.

## SECTION 14

## MISCELLANEOUS

**14.1** **Notices.** All notices, requests, demands and other communications under this Agreement must be in writing and shall be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (a) when personally delivered, (b) three (3) postal days after having been deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, or (c) one (1) business day after having been dispatched by a nationally recognized overnight courier service, or (d) upon the receipt of confirmation of a telephone facsimile transmission, at the following addresses:

> (a) If to the Company, to the Company at the address set forth in Section 1.4 hereof, and

> (b) If to a Member, to the address set forth on **Exhibit A**.

Any Person may from time to time specify a different address by written notice to the Company and to all Members.

**14.2** **Binding.** Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

**14.3** **Construction.** Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

**14.4** **Waiver of Appraisal.** Notwithstanding any provision which may be contained in the Last Will and Testament of a deceased Member, there is to be no inventory and appraisement of the Company assets or a sale of a deceased Member's Interest as a result of the death of a Member, and the Interest of a deceased Member is to be settled and disposed of exclusively in accordance with the terms of this Agreement.

**14.5** **Entire Agreement.** This Agreement, together with the Articles as each of the foregoing may be amended in writing from time to time (the "Organizational Documents"), contains the entire understanding among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement. There are no representations, agreements, arrangements or undertakings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed in the Organizational Documents.

**14.6** **Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or extent of this Agreement or any provision hereof.

**14.7** **Severability.** Every provision of this Agreement is intended to be severable. If any term or provision hereof is invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

**14.8** **Incorporation by Reference.** Every appendix, exhibit, schedule, and other document attached to this Agreement and referred to herein is to be deemed and is part of this Agreement.

**14.9**    **Further Action.**    Each Member shall perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**14.10**    **Variation of Pronouns.**    All pronouns and any variations are deemed to refer to masculine, feminine, or neuter, singular or plural, as the reasonable interpretation of this Agreement requires.

**14.11**    **Governing Law; Consent to Jurisdiction.**    The laws of the State of New York govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.  Each Member hereby consents to the jurisdiction of any state or federal court located in Nassau County, New York for purposes of the enforcement of this Agreement.  Each Member hereby waives in advance any objection to venue of any action constituted under this Section 14.11.

**14.12**    **Specific Performance.**    The parties acknowledge that it is impossible to measure, in money, the damages that shall accrue to a party or to the personal representative of a decedent from a failure of a party to perform any of the obligations under this Agreement.  Therefore, if any party or the personal representative or executor of any party enters into any action or proceeding to enforce the provisions of this Agreement, any Person (including the Company) against whom the action or proceeding is brought hereby in advance waives the claim or defense that the moving party or representative has or shall have an adequate remedy at law, and the Person shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists.

**14.13**    **Counterparts; Faxed or E-Mailed Signatures**.    This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  Any executed signature page delivered by facsimile or e-mail transmission shall be binding to the same extent as an original executed signature page, with regard to any agreement subject to the terms hereof or any amendment thereto.

**14.14**    **Agreement Drafted by Counsel**.  Each Member and Manager acknowledges that (i) Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone LLP, counsel for the Company, has prepared this Agreement on behalf of and in the course of its representation of the Company and not as counsel for any Member or the Manager, (ii) each Member and Manager has been advised of potential conflicts of interest that may exist, now or in the future, between such Member or Manager and those of the Company and the other Members or Manager, and (iii) the Members and Manager have been advised by such law firm to seek independent counsel.

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MANAGER:

_____
Howard Fensterman

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: *Michael Levitan*

Print Name: MICHAEL LEVITAN

23

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature:

Print Name:

23

Counterpart signature page for the Operating Agreement of

## MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature:

Print Name:     Benjamin Landa

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: _____

Print Name: James E. Vogel, JEV Revocable Trust, Revocable Trust.

Counterpart signature page for the Operating Agreement of

## MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature:     _*Allen Kass*_

Print Name:    _Trustee  ALLEN P. KASS_

_SUSAN 2000 TRUST_

23

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: _____

Print Name: _____

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: *Mark Kirschenbaum*

Print Name: *Mark Kirschenbaum*

23

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: _____

Print Name: Michael A. Bendett

Counterpart signature page for the Operating Agreement of

## MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature:

Print Name: Robert Feusterman

23

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of
MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: _____

Print Name: STEVEN SHAW

Counterpart signature page for the Operating Agreement of

## MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: _Renee Silverstein_

Print Name: _Renee Silverstein_

23

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature:

Print Name:   MIAN QADRUD-DIN

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: *Kristen Putterman*

Print Name: *KRISTEN PUTTERMAN*

23

Counterpart signature page for the Operating Agreement of

MICHIGAN LENDERS, LLC

    IN WITNESS WHEREOF, the undersigned has executed this Operating Agreement of MICHIGAN LENDERS, LLC as of the date first above written.

MEMBER:

Signature: _____

Print Name: _Howard Fensterman_

## APPENDIX A

## TAX MATTERS

**1.1    Definitions.**  Capitalized terms not otherwise defined herein have the meanings ascribed to them in **Appendix B** of the Agreement.

**1.2    Profits and Losses.**

(a)    After giving effect to the special and curative allocation provisions set forth in Sections 1.3 and 1.4 of this **Appendix A**, the Profits for each taxable year (or portion thereof) shall be allocated to the Members as follows:

(i)    First, to the Members who have a deficit balance in their Adjusted Capital Accounts (in proportion to such deficits) until no Member has a deficit balance in its Adjusted Capital Account;

(ii)    Second, to the Members (in proportion to their Unreturned Capital Contributions) until each Member has a positive balance in its Adjusted Capital Account equal to its Unreturned Capital Contributions; and

(iii)    Thereafter, to the Members in proportion to their Percentage Interests or in such amounts as are necessary to cause the positive balance in each Member's Adjusted Capital Account to equal, to the greatest extent possible, the amount that would be distributed to each Member were the Company to dissolve and terminate at the end of the taxable year in question, assuming for this purpose that the Company's assets are liquidated for their Gross Asset Value and that the net proceeds of such liquidation are distributed to the Members pro rata in accordance with Section 10.2(c) of the Agreement.

(b)    After giving effect to the special and curative allocations set forth in Sections 1.3 and 1.4 of this **Appendix A**, the Losses of the Company for each taxable year (or portion thereof) shall be allocated among the Members as follows:

(i)    First, to the extent that any Member's Adjusted Capital Account has a positive balance that is greater than (i.e., an excess balance) such Member's Unreturned Capital Contributions, to all such Members in proportion to such excess balances until such excess balance is reduced to zero;

(ii)    Second, to the Members in proportion to the positive balances in their Adjusted Capital Accounts, until no Member has a positive balance in its Adjusted Capital Account; and

(iii)    Thereafter, to the Members in proportion to their Percentage Interests in the Company.

**1.3    Special Allocations.**  The following special allocations shall be made in the following order:

(a)  **Minimum Gain Chargeback.**  Notwithstanding any other provision of this **Appendix A** and subject to the exceptions set forth in Sections 1.704-2(f)(2),(3),(4) and (5) of the Regulations, if there is a net decrease in Company Minimum Gain during a Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Section 1.704-2(f) of the Regulations.  This Section 1.3(a) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.  Notwithstanding the foregoing, to the extent such net decrease is attributable to a Member Nonrecourse Debt, then any Member with a share of the minimum gain attributable to such debt shall be allocated items of income and gain as provided in Section 1.704-2(i)(4) of the Regulations.

(b)  **Partner Minimum Gain Chargeback.**  Notwithstanding any other provision of this **Appendix A** except Section 1.3(a) and subject to the exception in Section 1.704-2(i)(4) of the Regulations, if there is a net decrease in Partner Minimum Gain attributable to Partner Nonrecourse Debt during a Company Fiscal Year, each Member who has a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Section 1.704-2(i)(4) of the Regulations.  This Section 1.3(b) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(c)  **Qualified Income Offset.**  In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in such Member's Adjusted Capital Account as quickly as possible, provided that an allocation pursuant to this Section 1.3(c) shall be made only if and to the extent that such Member would have a deficit balance in its Adjusted Capital Account after all other allocations provided for in this Section 1.3 have been tentatively made as if this Section 1.3(c) were not in this **Appendix A**.

(d)  **Gross Income Allocation.**  In the event any Member has a deficit balance in its Adjusted Capital Account at the end of a Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as

quickly as possible, provided that an allocation pursuant to this Section 1.3(d) shall be made only if and to the extent that such Member would have a deficit balance in its Adjusted Capital Account after all other allocations provided for in this Section 1.3 have been made as if Section 1.3(c) hereof and this Section 1.3(d) were not in this **Appendix A**.

(e)        **Nonrecourse Deductions.**  Nonrecourse Deductions for a Fiscal Year or other period shall be specially allocated among the Members in accordance with their then Percentage Interests.

(f)        **Partner Nonrecourse Deductions.**  Any Partner Nonrecourse Deductions for a Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i) of the Regulations.

(g)        **Section 754 Adjustments.**  To the extent the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(h)        **Imputed Interest Income.**  Any interest income imputed to the Company by reason of characterization of any payment of taxes by the Company as an advance to a Member pursuant to Section 5.2 of this Agreement shall be specially allocated to the Member who is treated as having received such advance.

**1.4        Curative Allocations.**

(a)        The **"Regulatory Allocations"** consist of the "Basic Regulatory Allocations," as defined in Section 1.4(b) hereof, the "Nonrecourse Regulatory Allocations," as defined in Section 1.4(c) hereof, and the "Partner Nonrecourse Regulatory Allocations," as defined in Section 1.4(d) hereof.

(b)        The **"Basic Regulatory Allocations"** consist of allocations pursuant to Sections 1.3(c), 1.3(d) and 1.3(g) hereof and the last sentence of Section 1.2(b) hereof. Notwithstanding any other provision of this **Appendix A**, other than the Regulatory Allocations, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Basic Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 1.4(b) shall only be made with respect to allocations pursuant to Sections 1.3(c), 1.3(d) or 1.3(g)

hereof to the extent the Manager reasonably determines that such allocations shall otherwise be inconsistent with the economic agreement among the parties to the Agreement.

(c)     The **"Nonrecourse Regulatory Allocations"** consist of all allocations pursuant to Sections 1.3(a) and 1.3(e) hereof.  Notwithstanding any other provision of this **Appendix A**, other than the Regulatory Allocations, the Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Nonrecourse Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Nonrecourse Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence (i) no allocations pursuant to this Section 1.4(c) shall be made prior to the Fiscal Year during which there is a net decrease in Company Minimum Gain, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Company Minimum Gain, and (ii) allocations pursuant to this Section 1.4(c) shall be deferred with respect to allocations pursuant to Section 1.3(e) hereof to the extent the Manager reasonably determines that such allocations are likely to be offset by subsequent allocations pursuant to Section 1.3(a) hereof.

(d)     The **"Partner Nonrecourse Regulatory Allocations"** consist of all allocations pursuant to Sections 1.3(b) and 1.3(f) hereof.  Notwithstanding any other provision of this **Appendix A**, other than the Regulatory Allocations, the Partner Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Partner Nonrecourse Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Partner Nonrecourse Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence (i) no allocations pursuant to this Section 1.4(d) shall be made with respect to allocations pursuant to Section 1.3(f) relating to a particular Partner Nonrecourse Debt prior to the Fiscal Year during which there is a net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Partner Minimum Gain, and (ii) allocations pursuant to this Section 1.4(d) shall be deferred with respect to allocations pursuant to Section 1.3(f) hereof relating to a particular Partner Nonrecourse Debt to the extent the Manager reasonably determines that such allocations are likely to be offset by subsequent allocations pursuant to Section 1.3(b) hereof.

(e)     The Manager shall have reasonable discretion, with respect to each taxable year, to (i) apply the provisions of Sections 1.4(b), 1.4(c), and 1.4(d) hereof in whatever order is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations, and (ii) divide all allocations pursuant to Sections 1.4(b), 1.4(c), and 1.4(d) hereof among the Members in a manner that is likely to minimize such economic distortions.

**1.5     Other Allocation Rules.**

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(b)     Except as otherwise provided in this **Appendix A**, all items of Company income, gain, loss, deduction, and any other allocations (including allocations of credits) not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

(c)     The Members are aware of the income tax consequences of the allocations made by this **Appendix A** and hereby agree to be bound by the provisions of this **Appendix A** in reporting their shares of Company income and loss for income tax purposes.

(d)     To the extent permitted by Sections l.704-2(h) and 1.704-2(i)(6) of the Regulations, the Manager shall endeavor to treat distributions of Net Cash from Sales or Refinancings as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account deficit for any Member.

(e)     Upon the exercise of any option to acquire Units, the Manager shall make other allocations or effect a shift of Capital Account balances of the Members as the Manager, in the Manager's sole discretion, shall determine to be necessary in order to properly reflect the interests of any option holder in the Company and to preserve the value of such option holder's option (i.e., by preserving the option holder's ability to realize the appreciation in value of a Unit over the option price applicable to his or her option). Any allocations or Capital Account shifts determined by the Manager to be necessary under the immediately preceding sentence shall be made over such period as the Manager determines to be reasonable. To the extent applicable, any such adjustments or allocations shall be made in a manner consistent with any temporary or final Regulations promulgated under Code Sections 704 or 721 or other applicable law then in effect with respect to partnership convertible obligations or options. Except as otherwise provided in any temporary or final Regulations under Code Sections 83, 704 or 721 or other applicable law then in effect if, in connection with the exercise of an option to acquire Units granted to an employee or consultant of the Company for services rendered to the Company, the Manager determines that it is necessary to effect a Capital Account shift in order to properly reflect the interest of  the person (the "Optionholder ") exercising the option in the Company, then the following shall occur: (A) the Company shall be deemed to have distributed an amount of cash to the Optionholder equal to the amount of the Capital Account balances of the other Members that are shifted to the Optionholder, and (B) the Optionholder shall be deemed to have contributed such amount to the capital of the Company.

**1.6     Tax Allocations; Code Section 704(c).**

(a)     In accordance with Code Section 704(c) and the Regulations thereunder,

income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

(b)     In the event the Gross Asset Value of any Company asset is adjusted, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)     Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 1.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

## **APPENDIX B**

### **DEFINITIONS**

"**Additional Member**" means any Person admitted as a Member pursuant to Section 2.3 hereof.

"**Adjusted Capital Account**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii)     Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"**Affiliate**" means, with respect to any Person:  (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person; (ii) any Person owning or controlling more than fifty percent (50%) of the outstanding voting securities of such Person; (iii) any officer, director, manager, trustee or general partner of such Person; or (iv) any Person who is an officer, director, manager, trustee or general partner or holder of more than fifty percent (50%) of the voting securities of any Person described in clauses (i) through (ii).

"**Agreement**" means this Agreement, as originally executed and as amended from time to time.  Terms such as "hereof," "hereto," "hereby," "hereunder" and "herein" refer to this Agreement as a whole, unless the context otherwise requires.

"**Bankruptcy**" means (i) the entry of a decree or order for relief against the Member by a Court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law ("Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of the petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of 60 days or which is not dismissed or suspended pursuant to Section 305 of the United States Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Law for the Member or for any substantial part of its assets or property,

or (vii) the making by a Member of any general assignment for the benefit of its creditors.

**"Capital Account"** means, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive shares of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 1.3 or Section 1.4 of **Appendix A** to this Agreement, and the amount of any Company liabilities assumed by such Member or which are secured by assets distributed to such Member.

(ii)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any assets distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 1.3 or Section 1.4 of **Appendix A** to this Agreement, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)     In the event all or a portion of an Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(iv)     In determining the amount of any liability for purposes of clauses (i) and (ii) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed assets or which are assumed by the Company or Members), are computed in order to comply with such Regulations, the Manager shall make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Person pursuant to Section 10 of the Agreement upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause the Agreement or **Appendix A** to the Agreement not to comply with Regulations Section 1.704-1(b).

**"Capital Contributions"** means, with respect to any Member, the amount of money and the initial Gross Asset Value of any assets (other than money) contributed to the Company with respect to the Interest held by such Person.

**"Code"** means the Internal Revenue Code of 1986, as amended from time to time (or any

corresponding provisions of succeeding law).

**"Company"** means MICHIGAN LENDERS, LLC.

**"Company Minimum Gain"** has the meaning set forth in Section 1.704-2(b)(2) of the Regulations.

**"Depreciation"** means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes as of the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

**"Dissolution Event"** has the meaning set forth in Section 10.1 of this Agreement.

**"Fiscal Year"** has the meaning set forth in Section 7.2 of this Agreement.

**"Gross Asset Value"** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(ii)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times:  (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Company to a Member of more than a *de minimis* amount of assets as consideration for an interest in the Company; (c) the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting as a Member or by a new Member acting as a Member or in anticipation of being a Member pursuant to Regulations Section 1.704-1(b)(2)(iv)(f)(iii), and (d) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a), (b), (c) and (d) above shall be made only if the Manager reasonably determines that such adjustments are necessary to reflect the relative economic interests of the Members in the Company;

(iii)     The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution; and

(iv)     The Gross Asset Values of Company assets shall be increased (or

decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 1.3(g) of **Appendix A** of this Agreement; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Manager determines that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Interest**" means a Member's entire ownership interest in the Company represented by one or more Units, including any and all benefits to which the holder of such an Interest may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement.

"**Manager**" means the manager appointed in accordance with Section 6.1 of this Agreement.

"**Member**" means any Person who (i) is referred to as such in the first paragraph of this Agreement or has become a Member pursuant to the terms of this Agreement, and (ii) has not ceased to be a Member pursuant to the terms of this Agreement.  Solely for purposes of the allocation, distribution and transfer provisions of **Appendix A** and Sections 4, 5, 8 and 10 of the Agreement (and any definitions relating thereto), a Member shall also be deemed to include an assignee or transferee of a Unit who has not been admitted to the Company as a Member. "Members" means all such Persons.

"**Member Nonrecourse Debt**" means nonrecourse debt of the Company under Section 1.704-2(b)(4) of the Regulations.

"**Negative Capital Account**" shall mean a Capital Account with a balance less than zero and, where the context requires, the negative balance thereof, in each case as of the end of a Fiscal Year, after giving effect to the following:

(a)     a credit for any amount required to be restored under Section 1.704-1(b)(2)(ii)(c) of the Regulations, as well as any amounts in addition thereto pursuant to Sections 1.704-2(g)(1) and (i)(5) of the Regulations, after taking into account any changes during such Fiscal Year in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and

(b)     a debit of the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

"**Net Cash From Operations**" means the gross cash from Company operations, including, without limitation, operating income, fees, interest and other income attributable to the

Company's business (but not including "Net Cash From Sales or Refinancing"), less the portion thereof used to pay or establish reserves for all Company expenses, payments, capital improvements, replacements and contingencies, all as determined by the Manager; provided, however, Net Cash From Operations shall not be reduced by depreciation, amortization, cost recovery deductions or similar non-cash allowances.

"**Net Cash From Sales or Refinancings**" means the net cash proceeds (after reduction for all attendant costs, sales commissions, expenses and any amounts applied to pay or repay any indebtedness of the Company in connection with the transaction) from all sales, exchanges or other dispositions of the Company's assets (other than dispositions of personal property in the ordinary course of business) and all financings and refinancings of the Company's property, less any portion thereof used to establish or fund reserves, as determined by the Manager. Net Cash from Sales or Refinancings shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with sales and other dispositions of Company property.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for a Fiscal Year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that Fiscal Year over the aggregate amount of any distributions during that Fiscal Year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain, determined according to the provisions of Sections 1.704-2(c) and (d) of the Regulations.

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"**Partner Minimum Gain**" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"**Partner Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

"**Partner Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(i)(1) of the Regulations. The amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for a Fiscal Year equals the excess, if any, of the net increase, if any, in the amount of Partner Minimum Gain attributable to such Partner Nonrecourse Debt during that Fiscal Year over the aggregate amount of any distributions during that Fiscal Year to the Member that bears the economic risk of loss for such Partner Nonrecourse Debt to the extent such distributions are from the proceeds of such Partner Nonrecourse Debt and are allocable to an increase in Partner Minimum Gain attributed to such Partner Nonrecourse Debt, determined in accordance with Sections 1.704-2(i)(2) and (3) of the Regulations.

"**Percentage Interest**" means, with respect to any Member, the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth in **Exhibit A** hereto bears to the total number of Units owned by all Members as of such date.

"**Permitted Transferee**" means any Person who receives Units pursuant to Section 8.2 of this Agreement.

"**Person**" means any individual, partnership, limited liability company, corporation, joint venture, trust, association or any other entity, domestic or foreign, and its respective heirs, executors, administrators, legal representatives, successors and assigns where the context of this Agreement so permits.

"**Profits and Losses**" mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1 (b)(2)(iv)(1), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(iii)     In the event the Gross Asset Value of any Company asset is adjusted, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the assets disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period; and

(vi)     Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 1.3 or 1.4 of **Appendix A** of this Agreement shall not be taken into account in computing Profits or Losses.

"**Regulations**" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Transfer**" (whether or not such term is capitalized) means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, assignment or other disposition by a Member and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, assign or otherwise dispose of a Member's Interest or Units.

"**Unit**" means a unit of ownership interest in the Company and shall represent an undivided interest in the holder's Capital Account balance.

"**Unreturned Capital Contribution**" means, with respect to any Member, such Member's aggregate Capital Contribution through the date of determination, less all distributions previously made to such Member pursuant to this Agreement.

# EXHIBIT A

## MEMBERS' NAMES, ADDRESSES,
## CAPITAL CONTRIBUTIONS, NUMBER OF UNITS,
## AND PERCENTAGE INTERESTS

| Name and Address of Members | Capital Contributions | Number of Units | Percentage Interest |
|---|---|---|---|
| Michael Levitan<br>2584 Lorna Place<br>Oceanside, New York 11572 | $250,000 | 13.14 | 13.14% |
| Barry Leistner<br>8-14 37th Avenue<br>Long Island City, New York 11101 | $250,000 | 13.14 | 13.14% |
| Benjamin Landa<br>945 Broadway<br>Woodmere, New York 11598 | $200,000 | 10.51 | 10.51% |
| James E. Vogel Revocable Trust<br>2401 Still Forest Road<br>Baltimore, MD 21208 | $200,000 | 10.51 | 10.51% |
| Susan Kass 2000 Trust<br>131 Hickory Kingdom Rd.<br>Bedford, NY 10506 | $150,000 | 7.88 | 7.88% |
| Martin Kass<br>75 Prospect Street<br>Demarest, NJ 07627 | $150,000 | 7.88 | 7.88% |
| Mark Kirschenbaum<br>92 Kent Road<br>Tenafly, New Jersey 07670 | $150,000 | 7.88 | 7.88% |
| Michael Bennett<br>3 Mallard Circle<br>Pomona, NY 10977 | $125,000 | 6.57 | 6.57% |
| Robert Fensterman<br>3700 South Ocean Blvd.<br>Suite 510<br>Highland Beach, Florida 33487 | $103,000 | 5.41 | 5.41% |
| Steven Shaw<br>9 Headley Way | $100,000 | 5.25 | 5.25% |

| | | | |
|---|---|---|---|
| Woodbury, NY 11797 | | | |
| Renee Silverstein<br>70-31 108th St.<br>Forest Hills, NY 11375 | $75,000 | 3.94 | 3.94% |
| Mian Qadrad Din<br>38 Mimosa Drive<br>Cos Cob, Connecticut 06807 | $50,000 | 2.63 | 2.63% |
| Kristin Putterman<br>2584 Lorna Place<br>Oceanside, New York 11572 | $50,000 | 2.63 | 2.63% |
| Howard Fensterman<br>3 Dakota Drive, Suite 300<br>Lake Success, New York 11042 | $50,000 | 2.63 | 2.63% |
| **TOTAL** | **$1,903,000** | **100** | **100%** |

**EXHIBIT B**

**JOINDER TO**
**OPERATING AGREEMENT**

This JOINDER (the "Joinder") to the Operating Agreement of MICHIGAN LENDERS, LLC, a New York limited liability company (the "Company"), dated as of February 23, 2018, as amended or restated from time to time, by and among the Members of the Company (the "Agreement"), is made and entered into as of [_____ __, 20___], by and between the Company and [_____] ("Holder"). Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Agreement.

WHEREAS, on the date hereof, Holder has acquired ___ Units from [_____] and the Agreement and the Company require Holder, as a holder of such Units, to become a party to the Agreement, and Holder agrees to do so in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Joinder hereby agree as follows:

A. **Agreement to be Bound**. Holder hereby (i) acknowledges that he/she/it has received and reviewed a complete copy of the Agreement and (ii) agrees that upon execution of this Joinder, he/she/it shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto.

B. **Members Schedule**. For purposes of Exhibit A to the Agreement, the name, address, capital contributions, number of Units and Percentage Interests of the Holder are as follows:

| Name and Address | Capital Contributions | Number of Units | Percentage Interest |
|---|---|---|---|
| [_____] | $_____ | _____ | ___% |
| [_____] | | | |
| [_____] | | | |

C. **Governing Law**. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of New York, and all rights and remedies shall be governed by such laws without regard to principles of conflicts of laws.

D. **Counterparts**. This Joinder may be executed in multiple counterparts (and may be transmitted via facsimile or other electronic submission) each of which shall be deemed to be an original and all of which taken together shall constitute one and the same

agreement.

E. **<u>Descriptive Headings</u>**.  The descriptive headings of this Joinder are inserted for convenience only and do not constitute a part of this Joinder.


**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have executed this Joinder to the Operating Agreement of MICHIGAN LENDERS, LLC as of the date set forth in the introductory paragraph hereof.

**MICHIGAN LENDERS, LLC**


By:_____
    Name:
    Title:


**HOLDER:**


_____

## EXHIBIT C

## PROMISSORY NOTE

$_____                                      _____, New York
                                                    [____ ____, 20__]

 FOR VALUE RECEIVED, MICHIGAN LENDERS, LLC, a New York Limited Liability company, having an address at 3 Dakota Drive, Suite 300, Lake Success, New York 11042 ("Payor"), does hereby agree to pay to the order of _____, an individual having an address at _____ ("Payee") in lawful money of the United States and in immediately available funds, an amount equal to _____and /100 ($_____) Dollars, plus interest, computed on the basis of a year of 360 days for the actual number of days for which principal is outstanding, accruing thereon from the date of this Promissory Note (this "Note") at the rate of [_____] percent (____%) per annum ("Interest"), which shall be due and payable in four annual installments in an amount equal to _____ _____and _/100 ($_____) Dollars, with payments commencing on the one year anniversary of the date hereof and continuing on the one year anniversary of each year thereafter through the date which is the fourth (4th) anniversary of the date on which the first payment is made hereunder on which all amounts outstanding under this Note shall have been paid in full (the "Maturity Date").

 This Note evidences an obligation of Payor.  If there is an Event of Default (as defined below) that is not cured within an applicable cure period, Payee may elect, by written notice delivered to Payor, to take any or all of the following actions: (i) declare this Note to be immediately due and payable, whereupon the entire unpaid principal, together with accrued and unpaid Interest thereon, shall become immediately due and payable; and (ii) exercise any and all other remedies provided hereunder or available at law or in equity upon the occurrence and continuation of an Event of Default.  If, after an Event of Default or the Maturity Date, this Note is referred to an attorney for collection or enforcement, Payor shall pay all costs and expenses associated with such collection or enforcement including, without limitation, reasonable attorneys' fees.

 The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Note: (i) the filing of a voluntary or involuntary petition by or against Payor under any provision of the United States Bankruptcy Code that is not dismissed within sixty (60) days; (ii) the application by Payor for or the appointment of a receiver; (iii) a general assignment by Payor for the benefit of creditors; (iv) if any payment hereunder is not made when such payment is due hereunder, after written notice and demand is made by Payee for payment; (v) a merger or consolidation of Payor with one or more other entities in which Payor is not the surviving entity; (vi) the happening of any other event that makes it unlawful, impossible or impractical to carry on the business of Payor; (vii) the voluntary dissolution of the Payor; (viii) upon entry of a decree of judicial dissolution of Payor under Section 702 of the New York Limited Liability Company Law; and (ix) the sale or other disposition of all or substantially all of the business or assets of Payor.

 A waiver by Payee of any breach of any of the terms or conditions of this Note must be in writing and shall not in any way affect, limit or waive Payee's rights at any time to enforce strict

compliance thereafter with every other term or condition of this Note.  All remedies under this Note shall be cumulative and not alternative.

Payee may renew or extend this Note at its discretion without affecting any obligations of Payor hereunder.

Payor may prepay this Note at any time or from time to time, in whole or in part, without premium or penalty.  All amounts prepaid hereunder shall be applied first to accrued but unpaid Interest due under this Note and then to installments in the reverse order in which they are due under this Note.  All rights of Payee under this Note are cumulative and may be exercised concurrently or consecutively at Payee's option.

All notices, requests, demands and other communications which are required to be or may be given under this Note shall be in writing and shall be deemed to have been duly given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one (1) business day after deposit with the courier); or (ii) if sent via mail, at the earlier of its receipt or five (5) days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid; or (iii) if sent via facsimile, upon electronic confirmation of facsimile transmission, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day; or (iv) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

If and to the extent that any court of competent jurisdiction holds any provision (or any part thereof) of this Note to be invalid or unenforceable, such holding shall in no way affect the validity of the remainder of this Note.

Payor hereby waives diligence, presentment, demand, protest and notice of any kind, except as specifically provided herein.

This Note shall be binding upon Payor's successors and assigns and shall inure to the benefit of the heirs, executors, successors and assigns of Payee.  This Note may not be assigned by Payor without the written consent of Payee.

This Note shall be governed by the laws of the State of New York, without giving effect to its principles of conflicts of law.

IN WITNESS WHEREOF, this Note is hereby executed as of the date first written above.

MICHIGAN LENDERS, LLC

By: _____
    Name:
    Title: